UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No.00-2244(DSD/FLN)

Miller & Schroeder Investments Corporation, a Minnesota corporation,

Plaintiff,

v. **ORDER**

President R.C.-St. Regis Management Company a New York general partnership,

Defendant.

John C. Thomas, Esq., Brian E. Palmer, Esq., Marianne D. Short, Esq. and Dorsey & Whitney, 50 Sixth Street South, Suite 1500, Minneapolis, MN 55402, counsel for plaintiff.

Richard A. Kaplan, Esq., Daniel C. Bryden, Esq. and Kelly & Berens, 3720 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402 and Loretta M. Gastwirth, Esq. and Meltzer, Lippe, Goldstein & Schlissel, 190 Willis Avenue, Mineola, NY 11501, counsel for defendant.

This matter is before the court on plaintiff's motion for summary judgment [Docket No. 28] on its claim against defendant and for summary judgment on defendant's counter-claim. Based on a review of the file, record and proceedings herein and for the reasons stated, the court grants plaintiff's motion.

FILED 2-21-02
RICHARD D. SLETTEN, CLERK
Judgment Ent'd. 2-21-02
Deputy Clerk's Initials

**BACKGROUND**

Defendant President R.C.-St. Regis Management Company ("President R.C.") agreed to finance the development of a gaming facility (the "casino") on the New York reservation of the St. Regis Mohawk Tribe (the "tribe"). In 1999, Miller & Schroeder Investments Corporation ("M&S") loaned President R.C. over $12,000,000 to finance this project. The loan terms were set forth in two loan agreements dated February 24, 1999.[1] President R.C. was required to make two separate payments on the debt. First, an interest payment was due each month beginning in March 1999. Second, monthly payments on the loan principal were due beginning in June 1999. Failure to make either payment constituted a default under the terms of the loan agreement. (See Loan Agreement § 7(b), § 7(d).)[2] On the occurrence of a default, "or at any time thereafter until such [default] is cured to the written satisfaction of [M&S]," the loan agreement gives M&S the right to declare immediately due and payable all principal, interest, fees and other amounts due under the agreement and to pursue any other remedy permitted by law. (See Loan Agreement § 7.)

---

[1] It is undisputed that the terms of the two loan agreements are identical for purposes of this motion and will therefore be simply referred to as the "loan agreement." (See Walter K. Horn Dep., Exs. A and B.)

[2] The loan agreement is attached both as Ex. A to the Horn Dep. and as Ex. D to the Horn Aff.

In addition to the loan agreement, an elaborate contractual structure was created where monies payable to President R.C. by the tribe under a separate management agreement would be channeled to help make the monthly payments of principal and interest to M&S. In this structure, M&S acquired an interest in certain "pledged revenues" of the casino. The loan agreement defined "pledged revenues" as "all payments of (i) management fees and (ii) repayment of Development Expenses, together with interest thereon at the rate provided in the Management Agreement, required to be made by the Tribe to the Borrower pursuant to the Management Agreement." (See Loan Agreement § 1.01 at 6.) These pledged revenues were to be assigned to M&S and deposited in an escrow account and made available for payment to M&S as soon as President R.C.'s rights to receive them accrued - that is, as soon as net operating revenues sufficient to pay President R.C.'s management fees became available pursuant to the management agreement.[3]

The parties agreed to amend the loan agreement on two separate occasions because the casino was not generating its projected revenues. On June 18, 1999, the parties amended the loan agreement

---

[3] In order to facilitate this arrangement, President R.C. and M&S entered into a series of written agreements. These included: (1) the loan agreements between President R.C. and M&S; (2) the promissory notes; (3) a notice and assignment of pledge signed by President R.C., M&S and the tribe; and (4) an escrow agreement. All of these documents collectively constitute the entire agreement between the parties at the time the loans were made. (See Horn Aff. Exs. B, C, D, E.)

to delay commencement of principal payments until September 20, 1999. Again, on December 15, 1999, the parties delayed commencement of principal payments, this time until August 20, 2000. Both amendments specifically provided that the original loan agreement, including President R.C.'s obligation to make monthly interest payments, was to remain in "full force and effect" except as expressly amended.[4] (See Horn Dep. Exs. C, D, E.)

President R.C. made interest payments to M&S until February 2000. After that date, it stopped making payments of any kind on the promissory notes. (See id. at 108-109.) Soon after, the tribe terminated President R.C.'s right to operate the casino on grounds of misconduct. (See id. Exs. J, K.) In a letter dated March 8, 2000, M&S requested that President R.C. resume payments on the notes. (See Ivan Kaufman Dep. Ex. 6.) President R.C. failed to do so. (See Horn Dep. at 108-109.) By a letter dated April 20, 2000, M&S declared President R.C. in default on the notes. (See id. Ex. G.) On May 9, 2000, M&S gave notice to President R.C. that pursuant to § 7 of the loan agreement, all unpaid interest, principal and fees due under the notes were due and payable immediately. (See id. Ex. H.)

---

[4] The loan agreement and these amendments state that, taken together, they define the entire relationship of the parties. The loan agreement also contains a merger clause and requires any modification of the loan agreement to be memorialized in a signed writing. (See Loan Agreement § 8.07 and § 8.24.)

M&S initiated the present action to recover the money due under the loan agreement and now moves for summary judgment on its breach of contract claim against President R.C. and on President R.C.'s counterclaim for declaratory judgment. For the reasons stated, the court will grant plaintiff's motion and dismisses defendant's counter-claim with prejudice.

**DISCUSSION**

**I. Standard for Summary Judgment**

Federal Rules of Civil Procedure 56 provides that a movant is entitled to summary judgment if evidence shows there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Civ. P. 56(c). In a case involving the breach of a promissory note, the plaintiffs sustains its "initial burden of demonstrating entitlement to judgment as a matter of law by submitting proof of the existence of the promissory note and the defendant's default in payment." Beube v. English, 206 A.D.2d 339, 614 N.Y.S.2d 44, 45 (N.Y. App. Div. 1994); Citibank, N.A. v. Benedict, 2000 WL 322785, at *4 (S.D.N.Y. March 28, 2000). Once a plaintiff establishes a breach of a promissory note, the burden shifts to the defendant to defeat summary judgment by demonstrating the existence of a bona fide defense based upon the factual record. Generale Bank, New York Branch v. Wassel, 1995 WL 312466, at *2

(S.D.N.Y. May 19, 1995); O'Brien v. O'Brien, 258 A.D.2d 446, 685 N.Y.S.2d, 254, 254 (N.Y. App. Div. 1999).

**II. Plaintiff is Entitled to Summary Judgment on its Breach of Contract Claim and on Defendant's Counterclaim**

Under New York law, the terms of a contract must be construed so as to give effect to the intent of the parties as indicated by the language of the contract. Slatt v. Slatt, 64 N.Y.2d 966, 967, 477 N.E.2d 1099, 1100, 488 N.Y.S.2d 645, 646 (1985); Morlee Sales Corp. v. Mfrs. Trust Co., 9 N.Y.2d 16, 19, 172 N.E.2d 280, 282, 210 N.Y.S.2d 516, 518 (1961). Only when the language of the contract is ambiguous may a court turn to extrinsic evidence of the contracting parties' intent. Int'l Klafter Co. v. Cont'l Cas. Co., 869 F.2d 96, 100 (2d Cir. 1989); Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d 51, 56, 396 N.E.2d 1029, 1032, 421 N.Y.S.2d 556, 559 (1979).

Whether a contract term is ambiguous is a question of law. Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987); Sutton v. E. River Sav. Bank, 55 N.Y.2d 550, 554, 435 N.E.2d 1075, 1077, 450 N.Y.S.2d 460, 462 (1982). A term is ambiguous when it is "'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" Walk-In Med.,

818 F.2d at 263 (quoting Eskimo Pie Corp. v. Whitelawn Dairies, Inc., 284 F.Supp. 987, 994 (S.D.N.Y. 1968) (Mansfield, J.)). Conversely, "[c]ontract language is not ambiguous if it has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir. 1989) (quoting Breed v. Ins. Co. of North Am., 46 N.Y.2d 351, 355, 385 N.E.2d 1280, 1282, 413 N.Y.S.2d 352, 355 (1978)). When a contract is unambiguous, its interpretation is a legal question properly decided by the court. See W.W.W. Assocs. Inc. v. Giancontieri, 77 N.Y.2d 157, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440, 443 (1990).

After careful review of the contract, the court finds that the terms of the contract at issue are unambiguous. Furthermore, under the unambiguous terms of the contract, President R.C. is required to make payments on the notes each month. It is undisputed that President R.C. stopped making payments on or around February 2000, and M&S's loan has not otherwise been repaid. Since President R.C. has failed to make payments which are expressly required by the terms of the loan agreement, and fails to establish a bona fide defense to enforcement of the loan agreement, M&S is entitled to summary judgment on its breach of contract claim as a matter of law.

President R.C. argues summary judgment is inappropriate because: (1) the notes are part of "other" agreements that raise fact issues as to the parties' intent that repayment was to be conditioned upon casino revenues; (2) alternatively, President R.C.'s separate legal action against the tribe constitutes a reasonable effort to cure; and (3) disputed fact issues exist concerning the priority of the payment of debts in light of a subsequent and separate agreement made between Ivan Kaufman and President R.C.[5] The court, however, is unpersuaded by any of defendant's arguments and considers them to lack a sufficient basis in law or fact and to be contrary to the express terms of the contract.

First, the court fails to find any language in the several documents that constitute the loan agreement that limits President R.C.'s obligations to make payments vis-a-vis the escrow agreement or that directly conditions repayment of the debt on casino revenues. Rather, the court concludes that the loan agreement unconditionally requires President R.C. to make interest payments on its debt and explicitly states that any failure to make such

---

[5] In addition to receiving the loans from M&S, the owner of President R.C., Ivan Kaufman ("Kaufman"), invested an additional $3.5 million in the casino that was memorialized in a separate agreement between President R.C. and Kaufman dated October 23, 2000. (See Kaufman Dep. Ex. 19.) As will be discussed, defendant unsuccessfully attempts to assert in its counter-claim that this separate agreement between Kaufman and President R.C. takes priority over the M&S loan.

payments constitutes a default. (See Loan Agreement §§ 2.02, 2.05 and § 7.)[6] Put differently, since the court fails to see any relevant limitation or condition on President R.C.'s repayment obligation in any part of the contract, President R.C.'s payment obligation is unconditional. See Yoi-Lee Realty Corp. v. 177th Realty Assocs., 208 A.D.2d 185, 190, 626 N.Y.S.2d 61, 65 (N.Y. App. Div. 1995).

As a matter of law, this court must enforce the clear and unambiguous language of the parties' contract. See State v. Am. Mfrs. Mut. Ins. Co., 188 A.D.2d 152, 154-155, 593 N.Y.S.2d 885 (N.Y. App. Div. 1993); Preminger v. Columbia Pictures Corp., 267 N.Y.S.2d 594, 599 (N.Y. 1966) ("where the parties have particularized the terms of a contract, an apparently inconsistent general statement to a different effect must yield.").[7] Since it

---

[6] The court also notes that the express language of the loan agreement anticipates potential assertions of ambiguity and clearly provides that the express provisions of the contract shall control. (See Loan Agreement § 8.24 ("[i]f any term of any of the other Loan Documents expressly conflicts with the provisions of this Agreement, the provisions of this Agreement shall control ...")). That is, to the extent that defendant attempts to assert that any "other documents" of the loan agreement allegedly contradict the unconditional payment obligation, the explicit language creating the obligation to pay must control.

[7] Moreover, when the terms of a promissory note are unambiguous and unconditional, parol evidence is barred as a matter of law. See Gurary v. Light, 248 A.D.2d 507, 508, 669 N.Y.S.2d 894 (N.Y. App. Div. 1998; Charter Realty & Dev. Corp. v. Rotterdam Mall Assocs., L.P., 242 A.D.2d 656, 656, 664 N.Y.S.2d 943, 943 (N.Y. App. Div. 1997)(holding that parol evidence is inadmissible if it contradicts clear contract terms).

is undisputed that President R.C. failed to make payments after February 2000, defendant is in default and M&S is entitled to the remedies provided in the agreement including the present legal action for breach. Accordingly, and after careful consideration of the plain language of the contract as a whole, the court sees no basis for President R.C.'s claim that repayment of the borrowed monies was limited to casino revenues. Plaintiff is entitled to summary judgment on its breach claim.

Additionally, after carefully reviewing § 7 of the loan agreement, the court also concludes that President R.C. has no right to cure a default resulting from its own failure to make required payments. Section 7 of the loan agreement expressly states:

> Upon occurrence of any of the following events ... (b) failure to pay the principal of, interest on or servicing fee with respect to the Loan (the "Obligations") when due; ... (d) default *in any other covenant or agreement* binding on the Borrower under any of the Loan Documents which default is not cured within fifteen (15) Business Days after written notice thereof shall have been given by [M&S] to [President R.C.] for any default which can be reasonably cured with fifteen (15) Business Days and a reasonable period of time for a default not reasonably capable of cure within fifteen (15) Business Days provided the Borrower diligently commences and continues a course of action to so cure.

Loan Agreement § 7 (emphasis added).

Reading § 7 as a whole, the court concludes that the unambiguous language of the contract sets forth a number of events

which entitle M&S to declare the loan agreement in default while permitting President R.C. to cure only a limited subset of these defaults. (See Loan Agreement § 7.) Because a default for lack of payment is listed separately from the subset of curable defaults, it is expressly excluded from the cure provisions of the contract. The court must enforce this language as written. See Am. Mfrs. Ins. Co., 188 A.D.2d at 154-155.[8] President R.C. thus has no right to cure for its failure to make monthly payments on the loan.

Lastly, the court concludes that there is no legal basis for President R.C.'s counterclaim of priority. While defendant argues that the separate arrangement between Kaufman and President R.C. has priority over the M&S loan, the court does not agree. The loan agreement contains no language recognizing a priority for working capital advances and imposes an unambiguous and unconditional requirement on President R.C. to repay its debt. Moreover, the loan agreement expressly acknowledges that it is "the entire agreement of the parties on the subject matter" and requires that President R.C. obtain written approval before it incurs any additional debt which would take priority over the money owed to M&S. (See Loan Agreement § 6.30, § 8.07 and § 8.24.)

---

[8] Moreover, if President R.C.'s interpretation of § 7 were applied, President R.C. would be allowed to cure rights for any default and this interpretation would impermissibly render the words of default "in any other covenant" meaningless. (See Loan Agreement § 7(d).)

Thus, since President R.C.'s priority argument is contrary to the express language, including the unambiguous integration clause, of the loan agreement, defendant's claim of priority has no legal basis. See Bluegrass Investments, Inc. v. Hodges, 161 A.D.2d 301, 303, 555 N.Y.S.2d 78, 79 (N.Y. App. Div. 1990) (parol evidence is inadmissible when an agreement is unambiguous).[9] The court considers the subsequent loan arrangement between Kaufman and President R.C. to be irrelevant to the payment obligations created by the underlying contract in dispute here.[10] M&S is thus entitled to summary judgment on President R.C.'s counterclaim as a matter of law.[11]

After carefully reviewing the clear language of the loan agreement including the promissory notes, the notice and assignment of pledge, and the escrow agreement, the court concludes that M&S

---

[9] The court also concurs with plaintiff's assertion that defendant's reliance on this case is misplaced in light of the fact that the loan agreement here unconditionally requires defendant to repay its debt obligation to plaintiff unlike Bluegrass where the contract contained language that limited performance to certain funds. See Bluegrass, 555 N.Y.S.2d at 79. (See Pl.'s Rep. at 4.)

[10] The court also notes that this subsequent loan arrangement between Kaufman and President R.C. was recorded after President R.C. had already defaulted on its M&S loans and after M&S had initiated the present lawsuit.

[11] Defendant also argues that the doctrine of partial performance and equitable estoppel stand to support its counterclaim. However, after considering these arguments, the court believes that these legal doctrines cannot support defendant's counterclaims as a matter of law in light of the unambiguous payment obligations as created in the underlying contract and as discussed.

is entitled to summary judgment on its claim of breach of contract and on defendant's counter-claim as a matter of law. These documents, when read in their entirety, do not limit or modify defendant's obligations to repay the debt. Defendant's attempt to circumvent the loan agreement is contrary to law and M&S is entitled to summary judgment.

## CONCLUSION

For the reasons stated, **IT IS HEREBY ORDERED** that plaintiff's motion for summary judgment is granted and defendant's counterclaims are dismissed with prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 21, 2002

David S. Doty, Judge
United States District Court

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*

Forms/8thcircuitprehearingconf.wpd

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.